DENNIS, Justice.
In this private adoption dispute the issues are (1) whether the eighteen year old natural mother’s consent to the surrender and adoption were vitiated by duress (natural mother’s family refused to let her bring baby home) or her attorney’s conflict of interest (her attorney was the partner of the lawyer who placed the child with the adoptive parents and handled the adoption free of charge, as he had done in previous cases, because of strong anti-abortion beliefs); and, if not, (2) whether the record *1004 and the reasons support the trial court’s judgment that the adoption is in the best interest of the child where the natural mother was a fit parent, the court gave no apparent weight to her biological relationship with the child, the evidence was insufficient to determine whether the child has developed a psychological relationship with the adoptive parents, and the trial court based its decision primarily upon the comparative wealth and income of the parties. The trial court decided that the act of surrender was valid and that adoption was in the child’s best interests. The court of appeal affirmed, 518 So.2d 23. We affirm as to the validity of the act of surrender but vacate the lower courts’ judgments and remand for a new hearing on whether the adoption is in the best interest of the child. The refusal of the adult natural mother’s family to assist her in rearing the child was not unlawful duress of the nature that warrants vitiation of her consent or the surrender for adoption. At the time of the act of surrender, only reasonably effective representation, rather than completely independent counsel, was required; in the absence of a showing that the natural mother’s attorney induced her to commit error that influenced her consent, vitiation thereof is not warranted. Of the three most important factors to be considered in a private adoption case in determining the best interests of the child, viz., fitness, psychological attachment, and biological relationship, the trial court evidently took only fitness into account. Since the record does not contain sufficient evidence on the psychological relationship factor for us to make a judgment at this level, the case will be remanded for a new best interest hearing.
The facts of this case follow a sadly familiar pattern. Dawn B., an eighteen year old unmarried woman, was employed in a grocery store but remained economically dependent on her mother and stepfather, Mr. & Mrs. B., with whom she resided. She became pregnant but concealed the fact from her mother for six months. At that time, with her mother’s financial assistance, she traveled by bus from her home in Zachary to consult with a doctor at an abortion clinic in Metairie. The doctor informed her that her pregnancy was too far into its term to permit an abortion. Instead, he gave her the name and phone number of an anti-abortionist attorney, Perez, who would arrange for the placement of the child for private adoption free of charge. When she returned home Dawn placed a call to Perez but had to leave her number because he was out. When Perez returned the call, Dawn’s mother, Mrs. B., answered and asked him to come to Zachary to discuss surrendering the expected child for private adoption. A few days later, Perez met with Dawn and Mr. and Mrs. B. in their home and explained what he was able to do: He could find a suitable couple to adopt the baby. He would have the couple pay the hospital, OBGYN, pediatrician, anesthesiologist, and drug bills. He explained that he would not charge a fee to them or the adoptive parents because his only interest was his personal cause of preventing abortions. Everything would be handled through him confidentially so that the identities of the two families would not be disclosed to each other. He told Dawn that she could change her mind and reclaim her child at any time up until the act of surrender was signed. Dawn, her mother and her stepfather agreed to the arrangement and asked him to proceed.
Between that meeting and the birth of the child Perez said he talked with Dawn on numerous occasions over the phone. On these occasions she called him to see if checks had been mailed for drug bills that she had sent him. During this period she gave him no indication of changing her mind with respect to the adoption.
After the birth of the child on November 30,1985, Mr. Perez met with Dawn and Mr. & Mrs. B. at the hospital. Perez testified that he reminded them that his only interest was in seeing that the baby was born and told them that he would leave immediately if they wanted to keep the child. Dawn appeared to be sad about giving up the child, but this was not unusual, he said. At his request, she readily signed the hospital release form giving him permission to take the baby from the premises. Without *1005 any objection from Dawn he removed the baby from the hospital and took it to the prospective adoptive parents in Houma.
A week later, on December 7, 1985, Perez returned to Mr. & Mrs. B’s house in Zachary to have Dawn execute the act of surrender. He brought along his law partner, Roberts, to act as Dawn’s attorney and to advise her of her rights. Perez and the parents stepped out on the porch while Roberts and Dawn conferred in the house. Dawn testified that Roberts read the act of surrender to her, and that she did not ask any questions. She said that she told him to change the child’s name in the act, and he said that he would do so later. The act of surrender which Dawn signed before a notary and two witnesses after conferring with Roberts, declares that it was fully explained to her by the attorney and that she understood she was surrendering the child for adoption and terminating her rights as a parent of the child. We cannot consider Roberts’ testimony in this regard because he was not called as a witness.
While they were on the porch, Perez again informed Mrs. B. that Dawn could still change her mind and he offered to undertake the six hour round trip to fetch the child if Dawn did not want to sign the act of surrender. Mrs. B. replied that Dawn would like to keep the child but that the only way she could raise it would be on welfare and that, since she, Mrs. B., had already raised five children, she was not going to raise another. Perez testified that he did not interpret this remark as an indication that Dawn had changed her mind.
After the act of surrender was signed, Perez continued to receive medical bills and calls about their payment from Dawn. Sometime prior to December 30,1985, however, he received a letter from her revoking her consent to the adoption.[1]
The testimony of Dawn, Mrs. B. and Mr. B. reveals that the young natural mother signed the act and gave up her child although she knew that she had a right to refrain from doing so. Further, the record shows she surrendered the child not because of any improper act or omission by Perez or Roberts but primarily because she did not wish to undertake the hardship of caring for the child outside of her home and without her mother’s assistance.
Dawn testified that early on the morning that the act of surrender was executed her mother and stepfather told her that if she refused to sign the instrument she could not bring the baby into their house. She expressed how this affected her decision to sign the act in several ways: She signed because it was what her mother wanted; her mother wanted her to start a new life. She couldn’t bring the baby into the house and she had nowhere else to go with the baby. Although she could have gone to stay with her sister in Indiana, she would have had nowhere to go with the baby for the two days it would take for her to receive transportation fare from her sister or father in Indiana. This last explanation was inconsistent with other portions of her testimony in which she admitted that she had saved an unspecified sum of money before her child was born.
Dawn contradicted Perez on one point saying that he never told her that she had the right to refuse to surrender and reclaim her child. This disagreement is, however, without consequence because her testimony and that of her parents makes it clear that she fully understood her dilemma: she could either sign the act and lose her child or refuse to sign, keep her child, and lose her home and her mother’s support.
Mr. & Mrs. B. admitted that they had caused Dawn to sign the act of surrender by telling her that she could not bring the child home. They testified that they had experienced a change of heart because of the suffering Dawn had endured, that they regretted their actions which had been intended only for her own welfare, and that they now stood ready to support Dawn financially and in every other way should she recover custody of the child.
*1006 Mrs. B. testified that after Perez received Dawn’s revocation of consent he telephoned her and said that she and her husband would probably be “sued for financial responsibility.” She testified that she had told Dawn about this conversation. Since the communication occurred after Dawn had signed the act of surrender and had revoked her consent, however, it is clear that this message could have had no effect upon her consent to surrender the child for adoption. Moreover, Perez testified several times that he had not threatened or pressured Dawn in any way.
At the conclusion of the hearing on the issue of the validity of the surrender, the trial judge ruled that because Perez was not acting as the adoptive parents’ attorney, there was no conflict with his law partner’s representation of Dawn; that Roberts was Dawn’s attorney and that he provided her with adequate representation; that there was no coercion on the part of Perez or the adoptive parents; and that the pressure put on Dawn by her parents was not the type of coercion which would cause the act of surrender to be null and void. Therefore, the trial court concluded that the act of surrender was valid. Immediately after the trial judge’s ruling, the hearing as to the best interests of the child was held.
James P., the adoptive father, testified that he had been married for approximately ten years to Laura P. and that they had a two and a half year old girl whom they had adopted. He further testified that he was a high school graduate, had attended trade school for two and a half years and had over the years attended schools in connection with his employment. In relation to his job, he said that he had been a mechanic for Halliburtion for nearly ten years, earned about $41,000 a year, had around $44,000 in a profit sharing plan with Halli-burtion, that he rarely travels due to his work, and that he got three weeks of vacation every year. He also stated that he and his wife owned their four bedroom home, that they only had $5,000 left to pay on it, that he owned three automobiles, a small boat and a three wheel motorcycle. He added that he had recently borrowed $10,000 to build a bam type structure in his backyard. According to him, they have had the child since December 7, 1985, she sleeps with a heart and respiratory monitor because she has been identified as a candidate for crib death, his wife takes care of the child during the day, and the child had developed an attachment to them.
Mr. P. testified that the child “responds” well to him and is “close” to his wife. However, in his explanation of these terms he spoke only of “starting to turn over and goo and laugh” and of physicial resemblances. On the other hand, he did testify that the child stops crying more readily when picked up by his wife than by him.
Laura P. testified that she is a thirty year old high school graduate with two semesters at Nicholls State University in accounting and that she was a homemaker. She additionally testified that the child was doing fine, that the child’s medical problem was being taken care of, that the child slept in their room with them, and that they had decided to adopt no more children. She testified that the child is responding to her “real good”, that the child recognizes her, and that the child is progressing as well as their older adopted daughter.
Dawn stated that she was an eighteen year old high school graduate and that she worked at Winn Dixie about thirty-six hours a week making $110 a week. In response to a question about how she intended to care for the child, she answered that her parents had agreed to help take care of the baby both financially and by babysitting when she was not there, that someone would always be with the child, and that she was prepared to continue the precautions taken due to the child’s medical condition. She also testified that she intended to improve her job situation by continuing her education, that she intended to pay the P.s back for the medical expenses they incurred, and that the father of the child, who was in Indiana, had agreed to help her out financially. She, however, admitted that she did not have any idea of how much day care, insurance, food or diapers for the baby would cost. In conclusion, Dawn said she loved the child very *1007 much and that she thought she would be able to raise the child responsibly.
Dawn’s mother testified that she had raised five children, that she and her husband were willing and able to support Dawn and the baby financially, and that they would add Dawn and the child to their insurance. She added that she would do what ever was necessary to provide for the child’s medical problems.
The trial court found that the adoption was in the child’s best interest and entered an interlocutory decree of adoption. In his reasons for judgment the judge found it important that the P.s owned a large home on which they owed only $5,000, that James P., the main wage earner, made over $40,000 a year and had substantial savings, and that the P.s could provide the child a traditional family within which she could grow. He also thought it important that Dawn had originally sought an abortion, that she earned only minimum wage, that she was a single, working mother, who would have to rely on her parent’s aid in raising the child and that the child would be raised in a trailer. In concluding that it would be in the best interests of the child to grant the adoption, the judge found that Dawn, as an unmarried eighteen year old, could not offer the child the stable and financially secure family unit the P.s could, and that the P.s were sincerely committed to providing for the welfare of the child and that they could offer the child a stable, supportive, and loving family unit. Dawn appealed the trial court’s decision to the Court of Appeal, First Circuit, which affirmed for the reasons assigned by the trial court. 518 So.2d 23 (La.App. 1st Cir.1987).
We granted Dawn’s application for a writ of certiorari to review the affirmance of the trial court’s judgment. 519 So.2d 134 (La.1988).
ACT OF SURRENDER
The Private Adoption Act of 1979
The Private Adoption Act of 1979 applicable to this case provides that a parent of either a natural or legitimate child may execute a voluntary surrender of custody of the child for private adoption. La.R.S. 9:422.3.[2] If the act of surrender is executed in accordance with the procedures contained in the Act, the formal act constitutes evidence of a legal and voluntary surrender. Id. The voluntary surrender may be made only to a person or couple qualified to petition for adoption of the child and only for the purpose of actually adopting the child. La.R.S. 9:422.5. Additionally, the surrendering parent must sign the surrendering document freely and voluntarily, and the parent must be informed and understand that his or her rights to the child are to be terminated. La.R.S. 9:422.-6(2) and (4). The act of surrender may not be signed before the fifth day following the child’s birthday, and the surrendering parent must be represented by an attorney at the execution of the act. La.R.S. 9:422.7. However, to preserve anonymity, an attorney at law may be named in the act of surrender as representative of the adopting parents. La.R.S. 9:422.9.
By an act of surrender, the surrendering parent transfers legal custody of the child to the adopting parents and grants consent to their adoption of the child. La.R.S. 9:422.8. However, the surrendering parent may revoke her consent to the transfer and adoption by a written declaration within 30 days after executing the act of surrender. La.R.S. 9:422.10. Nevertheless, the withdrawal of consent will not prevent the adoption if the adoption is found to be in the best interests of the child. La.R.S. 9:422.11. Should an interlocutory decree have been entered without opposition, the child shall not be removed from the custody of the adopting parents nor adoption denied unless the department disapproves or the court finds the adopting parents unfit. Id.
Error, Fraud or Duress
The Private Adoption Act of 1979 does not provide for any method whereby *1008 the act of surrender may be set aside because of vitiated consent. However, the executed act of surrender, although highly regulated and specialized, is in essence a contract, namely an agreement by two or more parties whereby obligations are created, modified, or extinguished. La.Civ. Code art. 1906. Accordingly, as in other agreements, the consent necessary to the surrender of a child for private adoption may be vitiated by error, fraud or duress.[3] La.Civ.Code art. 1948; see Wuertz v. Craig, 458 So.2d 1311, 1313 (La.1984); Ball v. Campbell, 219 La. 1076, 1088-89, 55 So.2d 250, 254 (1951). Because plaintiff attacks the act of surrender in this case on grounds of duress and on another basis similar to error and fraud we will review the codal precepts applicable to these vices of consent.
Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party. La.Civ.Code art. 1949. Error may concern a cause when it bears on the nature of a contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation. La.Civ.Code. art. 1950.
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may result from silence or inaction. La.Civ.Code art. 1953. Error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance that has substantially influenced that consent. La.Civ.Code art. 1955. Fraud committed by a third person vitiates the consent of a contracting party if the other party knew or should have known of the fraud. La.Civ.Code art. 1956. Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence. La.Civ.Code art. 1957.
Consent is also vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party’s person, property, or reputation. La.Civ.Code art. 1959. A threat of doing a lawful act or a threat of exercising a right does not constitute duress. La.Civ.Code art. 1962. Nonetheless, threatening to do an act that is lawful in appearance only may constitute duress. Id. Age, health, disposition, and other personal circumstances of a party must be taken into account in determining the reasonableness of the fear. Id. Even if the threat has been exerted by a third party, consent is vitiated. La.Civ.Code art. 1961. A contract made with a third person to secure the means of preventing threatened injury may not be rescinded for duress if that person is in good faith and not in collusion with the party exerting duress. La.Civ.Code art. 1963.
Burdens of Proving Act of Surrender and Affirmative Defenses
The adopting parents, as parties who demand performance of the act of surrender, must prove the existence of the natural parent’s obligations thereunder to transfer custody and to consent to the adoption. La.Civ.Code art. 1831. The exclusive method by which they may prove this under *1009 La.R.S. 9:422.3 is by demonstrating that the act was executed in accordance with the provisions pertaining to that mode of adoption.[4] Once these requisites have been established, the formal act constitutes evidence of a legal and voluntary surrender. La.R.S. 9:422.3.
The natural parent who asserts that the act of surrender is null, or that it has been modified or extinguished, must prove the facts or acts giving rise to the nullity, modification or extinction. La.Civ.Code art. 1831. Therefore, the burden of proof is upon the natural mother to prove that her consent was vitiated by error, fraud or duress. See Couder v. Oteri, 34 La.Ann. 694 (1882).[5]
Application of Vitiation of Consent Precepts to this Case
Counsel representing the plaintiff natural mother in this court argues that the act of surrender is null because (1) Dawn’s consent was obtained by duress and (2) the attorney who advised her had a conflict of interest because he was the law partner of the attorney who was in effect representing Mrs. B., the plaintiffs mother.
The evidence does not establish that the plaintiff was subject to the type of duress which justifies vitiation of her consent. Her consent was not obtained by duress of such a nature as to cause her to have a reasonable fear of unjust and considerable injury to her person, property or reputation. La.Civ.Code art. 1959. Dawn’s decision to surrender her child for adoption was induced principally by her own desire to do what was best for the child and by her mother’s refusal to allow her to rear the child in her home. Mrs. B.’s decision to refuse assistance to her daughter in rearing the child did not pose a threat of considerable injury to Dawn’s person, property or reputation. Furthermore, even if we were to assume that the mother’s refusal could have caused a reasonable fear of considerable injury, the mother’s action still could not have constituted unlawful duress. Mr. & Mrs. B. had a legal right to refuse to allow the adult natural mother to rear the child in their home. Therefore, their refusal was an exercise or threat to exercise a right and did not constitute duress. La.Civ.Code art. 1962.
Plaintiff’s counsel contends additionally that Dawn was coerced because Perez told Mrs. B. that the adopting parents would bring an action against them to recover the medical and hospital expenses they had paid if they were unable to obtain custody of the child. This argument is without merit for several reasons. The trial court expressly found Perez’s testimony to have been truthful, and Perez testified that he did nothing to place any pressure on Dawn and told her that she could refuse to go through with the surrender. Further, because Mrs. B. testified that she received this message from Perez after Dawn had revoked her consent it could have had no effect upon Dawn’s consent to the act of surrender. Moreover, even if such a threat had occurred before the act of surrender, it would not have amounted to unlawful duress because it could not have created in Dawn a reasonable fear of injury to her person, property or reputation. Additionally, it would have been the adopting parents’ right to seek recovery of the health care expenses they had paid for Mrs. B.’s daughter, because they were advanced with the express consent and knowledge of Mr. and Mrs. B.
*1010 Counsel for plaintiff in this court also argues that the act of surrender is null because the attorney who advised Dawn at that time had a conflict of interest. Nevertheless, she does not contend that the record reflects that the attorney gave Dawn bad or inadequate advice. Instead, plaintiff maintains that under the Adoption Act of 1979 the act of surrender is null if the natural parent was not represented by independent, conflict-free counsel, regardless of whether her interests were prejudiced by the representation. We do not think, however, this was the legislative aim.
At the time of the act of surrender, La.R.S. 9:422.7, in pertinent part, provided simply that “[t]he surrendering parent or parents shall be represented by an attorney at the execution of the act of surrender.” Subsequently, the Legislature amended this part of the statute to provide that:
The surrendering parent or parents, and his, her, or their legal representative, if applicable, or the child’s tutor, as provided in R.S. 9:422.3(A), shall be represented at the execution of the act by an attorney at law licensed to practice law in Louisiana; provided, however, the attorney representing such person or persons shall not be the attorney who represents the person or persons who are the prospective adoptive parents, or an attorney who is a partner or employee of the attorney or law firm representing the prospective adoptive parents. La. R.S. 9:422.7(A) (Supp. 1988) (emphasis added).
Thus, the requirement that the attorney advising the surrendering parent must be completely independent of the attorney representing the prospective adoptive parents did not become part of the law until after the act of surrender in the present case had been executed. Consequently, we conclude that the adoption statute at the time of the surrender herein required only that the surrendering parent be represented by an attorney providing adequate or reasonably effective legal service.
The general rules of law governing vitiation of consent corroborate this interpretation. Error vitiates consent only when a party’s consent has been determined by it and when the other party knew or should have known that the matter affected by the error was the cause of the obligation for the party in error. La.Civ.Code art. 1949 and comments (b) & (c) thereto. Relief may be obtained on grounds of fraud even when the error thus induced did not concern the cause of the obligation or the reason why the party bound himself, provided that it concerned a circumstance that substantially influenced him to do so. La. Civ.Code art. 1955 and comment (b) thereto. Consent is vitiated when it has been obtained by duress of such a nature as to cause a person to do some act that he otherwise would not have done. La.Civ. Code art. 1959 and comment (b) thereto. In each of these cases the party who asserts that the obligation is null must prove some type of causal relationship between his consent and the vice that influenced it. In the absence of an express provision in the adoption statute to the contrary, the representation by counsel proviso, when asserted to vitiate consent, must be interpreted in reference to other laws on the same subject. La.Civ.Code art. 13. We conclude, therefore, that the Legislature, under the law in effect at the time of the surrender herein, must have intended to require that the surrendering parent, in order to annul the act or surrender, must at least show that her attorney’s conflict of interest induced an error concerning a circumstance that substantially influenced her to consent to the surrender. Otherwise, if the plaintiff’s argument were correct, acts of surrender could be set aside more easily for a harmless conflict of interest than for the most injurious act of outright fraud.
The plaintiff mistakenly relies on Wuertz v. Craig, 458 So.2d 1311 (La.1984), as precedent for her proposed interpretation of the statute. The majority of the court in that case did not find or rest its decision on a conflict of interest, however. Id. at 1314-15 (Marcus, Dennis, Blanche, Lemmon, JJ., concurring; Watson, J., dissenting). The holding in Wuertz was that the natural mother’s consent to the act of surrender was vitiated by duress produced by *1011 a threat of unjustified or malicious prosecution. Moreover, even the two-justice lead opinion, which did find that a conflict of interest existed, found it necessary to establish a causal relationship between the conflict and the mother’s consent to surrender in order to void the surrender. Wuertz v. Craig, supra, 458 So.2d at 1314 (“On the record before us, good representation of the mother would have prevented the surrender.”) (Dixon, C.J., with one justice joining). Thus, Wuertz may be more properly cited as an instance in which two members of this court have already embraced the statutory interpretation we now adopt.
Applying the statutory precept as interpreted herein, we conclude that the plaintiff is not entitled to have the act of surrender set aside because of a conflict of interest. Assuming that the attorney who advised her had adverse interests or responsibilities, plaintiff failed to prove that the conflict caused her to err concerning a circumstance that substantially influenced her to surrender the child for adoption. In fact, the plaintiff does not point to any evidence in the record for this purpose but simply relies on her legal argument, which we have rejected, that a conflict of interest per se vitiates consent.
Our dissenting brother alludes to one passage of the record which suggests to him that Dawn may have signed the act of surrender because she mistakenly thought she would have an absolute right to revoke her consent and recover the child later. From this he speculates that she may have been led into this error by her attorney’s failure to sufficiently explain the effects of the surrender and that this lapse on his part may have been due to his conflict of interest. Even if we could accept this chain of unsupported possibilities as probative evidence, we cannot agree with our colleague’s reading of the evidence from which he concludes that Dawn was misled as to the difficulty of reclaiming custody or that she viewed the surrender as a ploy to gain time. In that passage Dawn responded to questions by her trial attorney as follows:
Q. Did Mr. Perez threaten you in any way?
A. No.
Q. As I appreciate it what your mother or your stepfather or both of them were telling you was that you couldn’t stay home with the child if you didn’t sign the act of surrender?
A. Right. Yes.
Q Did you consider going somewhere else?
A. Yes.
Q. What happened?
A. I couldn’t have the baby. It would take a couple of days for me to get money to come home, to go back up to Indiana, and I couldn’t bring the baby in the house. So, where would I stay?
Q. So, you had no place to stay?
A. No. I don’t know nobody down there.
Contrary to our brother’s interpretation that Dawn labored under the delusion that recovery of the child would be easy or that she planned to revoke all along, we think her testimony indicates simply that when her mother told her that she could not bring the child to her house Dawn chose to surrender the infant for adoption rather than to undertake to raise the child on her own.
Having decided that, if any conflict existed, it did not induce error or influence Dawn’s consent, we hasten to add that we cannot conclude so quickly as did the court of appeal and the trial court that no conflict of interest existed in this case. We do not agree with the court of appeal’s reasoning that there was no conflict of interest simply because there was no contract of employment or fee arrangement between Perez and either the adoptive parents or the unwed mother or her parents. When attorneys are associated in a firm we cannot view each of them in isolation in deciding whether a conflict exists. To the contrary, Rule 1.10(a) of the Rules of Professional Conduct, a part of the general rule of imputed disqualification, provides that none of the lawyers associated in a firm *1012 shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.9, or 2.2. Therefore, if Perez would have been prohibited from representing Dawn under any of these provisions, Roberts as his partner was also forbidden to do so. We have not closely scrutinized the evidence to determine if a conflict existed in this particular case, and we do not propose to do so since we have disposed of the assignment of error on other grounds. Nonetheless, we point out for the benefit of the bar in general, that a conflict could have existed because of the imputation rule. For example, if Perez had been prohibited from representing Dawn because his representation may have been materially limited by his own interest in preventing abortions by promoting adoptions, without Dawn’s consent after consultation, any member of his firm would have been prohibited from representing her also. See Rule 1.7(b) Rules of Professional Conduct.
In conclusion, we do not rest our decision that the surrender was valid merely upon a consideration of the points raised by the plaintiff, i.e., duress and conflict of interest. We have carefully examined the record to ascertain if there was any other factor which may have prevented Dawn from making a knowing and voluntary surrender. We are convinced there was none. The record reflects that Dawn was a young adult capable of exercising her own judgment. Before her mother and stepfather informed her, in the belief that it was in her best interests, that she could not bring the child home, Dawn on her own investigated an abortion and placed a call to a lawyer for the purpose of arranging a surrender for a private adoption. Also before her parents’ ultimatum she. met with the lawyer, authorized him to proceed with adoption arrangements and signed a release permitting the attorney to remove the child from the hospital and take it to the adoptive parents. Undoubtedly, she was heavily influenced by her parents’ final edict, but her own testimony reveals that she was not without alternatives which would have permitted her to keep the baby. She had a father, sister and other relatives in Indiana and she acknowledged that she could have gone to live with her sister. Her contention that lack of money prevented her from taking the child to Indiana is difficult to understand in view of her admission that she had savings of her own and relatives willing to wire her funds. Consequently, her parents’ decision made it more difficult for her to keep the child but not so hard to deal with as to overcome her free will or choice. Furthermore, it is likely that Dawn continued to be influenced to some extent by her initial belief that adoption would be in the best interests of the child and herself. None of these factors was improper, unlawful or of such a nature as to deprive Dawn’s decision to surrender the child for adoption of its voluntariness.
BEST INTERESTS OF THE CHILD
The natural parent in this case timely exercised her right to revoke her consent to the surrender and to oppose the adoption. However, her action does not bar a decree of adoption if the adoption is in “the best interests of the child.” La.R.S. 9:422.11(A). Accordingly, in such a case there must be a best interest hearing to determine whether the adoption proceeding may go forward.
The statute does not allocate the burdens of proof with respect to the best interest of the child. But in our opinion both the burden of producing evidence and the burden of persuasion should be on the adoptive parents. The facts with regard to the crucial issue of the nature of the child’s relationship with the adoptive parents lie peculiarly within their knowledge. Additionally, they are more apt to be able to produce expert witness testimony helpful to the court in deciding what is in the child’s physical and emotional best interests. See McCormick, On Evidence, § 337, at 950 (3rd ed. 1984).
The exact scope of the standard “best interest of the child” under the private adoption statute has not been detailed by the Legislature or this court. But the policy reflected in these words is firmly established in other statutes and in the law of *1013 virtually every American jurisdiction.[6] The basic concept underlying this standard is nothing less than the dignity of the child as an individual human being. For this reason the words of the criterion cannot be precise and their scope cannot be static. “The best interests of the child” must draw its meaning from the evolving body of knowledge concerning child health, psychology and welfare that marks the progress of a maturing society.
Among modern legal and child psychological authorities, the consensus is that, of the multifarious considerations relevant to the best interests of a child in resolving a private custody dispute between the natural parent and the proposed adoptive parents, the most important factors are: (1) Whether each person seeking custody is fit to be the child’s parent; (2) Whether either of the adoptive parents has a psychological relationship with the child; and (3) The natural parent’s biological relationship with the child.[7]
Fitness
Custody should never be awarded to a claimant whose limitations or conduct would endanger the health of the child under minimum standards for child protection. The correct resolution of the dispute is obvious where one claimant poses an immediate and substantial threat to the child’s physical health and the other does not. In such a case, there is no need to make longer-term predictions or more complicated psychological evaluations of what is likely to happen to the child’s personality. Mnookin, supra n. 7, 39 L. & Contemp. Probs. at 261, 282.
Psychological Relationship
The court should prefer a psychological parent (i.e., an adult who has a psychological relationship with the child from the child’s perspective) over any claimant (including a natural parent) who, from the child’s perspective, is not a psychological parent. To award custody to a person who is a “stranger” to the child would unnecessarily risk harming the child where the other claimant has, on a continuing, day-to-day basis, fulfilled the child’s psychological needs for a parent as well as his physical need. Mnookin, supra n. 7, 39 L. & Contemp.Probs. at 282, 285.
Whether any adult becomes the psychological parent of a child is based on day-today interaction, companionship, and shared experiences. J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interest of the Child, 19 (2nd ed. 1979); Mnookin, Foster Care—In Whose Best Interest?, 43 Harv.Ed.Rev. 599 (1973); Note, In the Child’s Best Interest: Rights of the Natural Parents in Child Placement Proceedings, supra, 51 N.Y.U.L.Rev. at 450-51; Note, Family Law: Natural Parent Preference or the Child’s Best Interests: The Court’s Dilemma in S.O. v. W.S., 12 U.C.L.A. [UCLA] —Alaska L.Rev. 141, 150 (1982-83); Note, Alternatives to “Parental Right” in Child Custody Disputes Involving Third Parties, 73 Yale L.J. 151, 158-59 & 158 n. 34 (1963). The role can be fulfilled either by a biological parent or by any other caring adult— but never by an absent, inactive adult, whatever his biological or legal relationship to the child. J. Goldstein, A. Freud & A. Solnit, supra, at 18; Leonard & Provence, The development of Parent Child Relationships and the Psychological Parent, 53 Conn.B.J. 320 (1979). Thus, neither the biological relation nor the fact of legal adoption is any guarantee that an adult will become the psychological parent of a child.
The child’s psychological tie to a parent figure is not the simple uncomplicated rela *1014 tionship that it may appear to be at first glance. J. Goldstein, A. Freud & A. Solnit, supra, at 17. It is rooted in the infant’s ability to ensure his own survival, but a psychological interplay between adult and child is superimposed on the events of bodily care when the adult in charge is personally and emotionally involved. Id. at 18. The child soon brings to this interaction not only his needs for bodily comfort and nourishment but also his emotional demand for affection, companionship, and stimulating intimacy. Id. When these are answered reliably and regularly, the child-parent relationship becomes firm, with immensely productive effects on the child’s intellectual and social development. Id.; J. Bowlby, Maternal Care and Mental Health 11 (1952); Note, Alternatives to “Parental Right” in Child Custody Disputes Involving Third Parties, supra, 78 Yale L.J. at 158 n. 34. Continuity of parental affection and care provides the basis for the child’s sense of selfworth and security; parental discipline and example are essential for the child’s development of values and ideals. Note, In the Child’s Best Interests: Rights of the Natural Parents in Child Placement Proceedings, supra, 51 N.Y.U.L.Rev. at 450; see also J. Goldstein, A. Freud & A. Solnit, supra, at 31-34; Leonard & Provence, supra, 53 Conn.B.J. at 321.
On the other hand, when parental care is inadequate, or when the child suffers a loss, change or other harmful interruption of the child-parent relationship, particularly in his early years, the child may experience serious deficits in his mental or emotional growth. J. Goldstein, A. Freud & A. Sol-nit, supra, at 31-32; Note, Alternatives to “Parental Right” in Child Custody Disputes Involving Third Parties, supra, 73 Yale L.J. at 160 & n. 41 (citing Freud, Some Remarks on Infant Observation, 8 Psychoanalytic Study of the Child 17-19 (1953); Erikson, Growth and Crisis of the “Healthy Personality” in Personality In Nature, Society and Culture 190-97 (1955); Freud, Notes on Aggression, 13 Bull. Menninger Clinic 150-51 (1949)). In such cases, the child may regress along the whole line of his affections, skills, achievements, and social adaptation. J. Goldstein, A. Freud & A. Solnit, supra, at 32-34.
There is little disagreement within the profession of child psychology as to the existence of the phenomenon of the child-psychological parent relationship and its importance to the development of the child. Pikula v. Pikula, 374 N.W.2d 705, 711 (Minn.1985) (citing J. Goldstein, A. Freud & A. Solnit, supra, at 31-35; Klaff, The Tender Years Doctrine: A Defense, 70 Cal.L.Rev. 335, 348 (1982); Leonard & Provence, supra, 53 Conn.B.J. at 326; Okpaku, Psychology: Impediment or Aid in Child Custody Cases?, 29 Rutgers L.Rev. 1117, 1121-22 (1976)). A substantial and impressive consensus exists among psychologists and psychiatrists that disruption of the parent-child relationship carries significant risks. Mnookin, supra n. 7, 39 L. & Contemp.Probs. at 266 (citing J. Bowlby, Maternal Care and Mental Health (WHO Monograph No. 2, 1952); A. Freud & D. Bur-glingham, Infants Without Families: The Case For and Against Residential Nurseries (1944); Napier, Success and Failure in Foster Care, 2 Brit.J.Soc.Work 189 (1972); Ellsworth & Levy, Legislative Reform of Child Custody Adjudication, 4 Law & Soc. Rev. 167, 202-03 (1969)), Bowlby, Developmental Psychiatry Comes of Age, 145:1 AmJ.Psychiatry 1 (Jan.1988). The only disagreement among the experts appears to be over how great the significant risks are in comparison with other factors influencing a child’s mental and emotional growth. See Kagan, Kearsley & Zelazo, Infancy: Its Place in Human Development (1978); Rutter, Maternal Deprivation Reassessed (1972); Kadushin, Beyond The Best Interest of The Child: An Essay Review, 48 Soc.Serv.Rev. 508, 512 (1974); Rutter, Maternal Deprivation, 1972-78: New Findings, New Concepts, New Approaches, 50 Child Dev. 283 (1979); Strauss & Strauss, Book Review, 74 Colum.L.Rev. 996 (1974).
Biological Relationship
When the natural parent poses no danger to the child’s physical health, and the child has not yet formed an attachment to and begun to view one of the adoptive parents as his psychological parent, the *1015 natural parent should be preferred over others. Under broadly shared social values the general rule is that the responsibility and opportunity of custody is assigned to a child’s natural parents. The high value placed on family autonomy reflects a consensus that the natural parent-child relationship should be disturbed only if necessary to protect the child from physical or psychological harm. Moreover, preservation of the child’s sense of lineage and access to his extended biological family can be important psychologically, as evidenced by the felt need of some adoptive children to search out their natural parents. Mnookin, supra n. 7, 39 L. & Contemp.Probs. at 266-67, 383. See, e.g., In re Guardianship of Smith, 42 Cal.2d 91, 265 P.2d 888, 891 (1954); Johnson v. Kelly, 44 Ga. 485, 487 (1871); B. Lifton, Twice Born (1975).
Guidelines Not Applicable to Other Types of Disputes
These guidelines are consistent with the best interests of the child principle and should dispose of most private adoption cases. They are not meant to be applied to other types of custody disputes, however, even though the best interests standard and the psychological parent phenonome-non may have relevance to those cases. For example, these three guidelines would not be applicable to controversies between two natural parents, neither of whom would endanger a child’s physical health, where both are psychological parents. Mnookin, supra n. 7, 39 L. & Contemp. Probs. at 283. Psychologists and psychiatrists can rather consistently differentiate between a situation where an adult and a child have a substantial psychological relationship and that where there is no relationship at all. But existing psychological theories do not provide the basis for choosing generally between two adults where the child has some relationship and psychological attachment to each. Mnookin, supra n. 7, 39 L. & Contemp.Probs. at 287. Furthermore, these private litigation guidelines certainly are not appropriate for use in public law proceedings such as actions under the child neglect or foster care laws. Legal standards in those types of cases must guide the courts in deciding when the state should intrude coercively on family autonomy and in making the bureaucracy purposeful and accountable, problems with which the private dispute guidelines discussed here are not concerned. Mnookin, supra n. 7, 39 L. & Contemp.Probs. at 265-68.
Application of the Best Interests Guidelines to This Case
The trial judge concluded that the adoption was in the best interests of the child. In its reasons the court compared wealth and earning capacities of the parties and concluded that Dawn, “an unmarried eighteen year old, cannot offer the child the stable and financially secure family unit that the [P.s] provide.” The court did not determine whether there was a substantial psychological relationship (from the child’s perspective) between the child and the adoptive parents and gave no apparent weight to the child’s biological relationship to the natural mother. It is implicit that the court found the natural mother, as well as the adoptive parents, fit to have custody, because it did not declare any of them unfit and there is no warrant in the record for such a finding. The court of appeal merely adopted the trial court’s reasons on the issue of the best interests of the child.
Applying the best interests guidelines we conclude that the trial court fell into error by omitting any consideration of two of the most important factors in a private adoption case, viz., the natural mother-child biological relationship and the possible psychological tie of the child to one or both of the adoptive parents. Instead, the trial court based its decision primarily on the relative wealth of the parties, a factor that can have little, if any, relevance in a case of this kind. If the natural mother is fit, the broad social policy of basing custody and responsibility on the biological relationship outweighs whatever material advantages might be provided by the adoptive parents, if neither of the adoptive parents is the child’s psychological parent. On the other hand, if the adoptive parents are fit, and the child has formed a psychologi-cial attachment to one or both of them, the *1016 adoptive parents should be preferred so as to avoid the grave risk of mental and emotional harm to the child which would result from a change in custody, even if the natural parent is relatively affluent.
The record does not contain sufficient evidence from which we may determine whether the child had developed a substantial psychological relationship with one of the adoptive parents. There is no psychiatrist or psychologist testimony in the record and the adoptive parents’ testimony is only sketchy on this subject. The child who was five months old at the time of the best interest hearing, is now approximately 2½ years old. We can only speculate as to the child’s psychological development at the time of the hearing and as to what has occurred since. It is quite possible that the child by now has acquired a strong and healthy psychological attachment to her adoptive parents. There is also the possibility that the child tragically has no psychological parent. More happily, it is possible that the child has developed a psychological tie with her natural mother if there has been regular contact between the two. We cannot decide what is in the best interest of this child on the basis of these speculations.
Accordingly, in the interest of justice we will vacate the adoption decree and remand the case for a new hearing on the best interest of the child. The trial court is directed to take steps, including the appointment of an expert by the court if necessary, to develop evidence as to the child’s possible psychological attachment to the natural or adoptive parents. In order to expedite the completion of this case jurisdiction will be retained by this court. Any dissatisfied party may seek relief here upon the finality of the trial court’s decision. The trial court is further instructed to conduct the new best interest hearing and render its decision with all possible dispatch.
The Best Interests of the Child Require Prompt and Final Decisions
The best interest hearing under the private adoption statute should be scheduled and conducted expeditiously in order to afford the natural mother who timely revokes her consent a real opportunity to reclaim her child. Otherwise, if the hearing is scheduled and conducted at the normal pace of other civil proceedings, the child often will have become psychologically attached to the adoptive parents before the hearing and cannot be returned to his biological parent without subjecting him to the risk of permanent mental and emotional harm. Furthermore, even if the case is decided promptly and correctly by the trial court, the normal appellate delay may have unsettling and harmful effects upon the developing relationship between the child and his psychological parent.
The facts of this case, which unfortunately are not atypical, illustrate the problems caused by the law’s ordinary delay in adoption cases. The child was born on November 30, 1985, and surrendered for adoption on December 7, 1985 when she was one week old. The natural mother revoked her consent within thirty days of this date, at which time the child could not have been over five weeks old. The adoptive parents filed a petition for adoption on January 30, 1986 when the child was two months old. The best interest hearing was not held until April 15, 1986 by which time the child was almost 5 months old. The trial court rendered a judgment that the surrender was valid and the adoption was in the child’s best interest on June 20, 1986 when the child was almost seven months old. The court of appeal affirmed the trial court’s judgment on December 22, 1987 by which time the child was over two years old.
Delays of this kind cannot be tolerated under an adoption statute which was intended to (1) grant the natural parent a brief but meaningful opportunity to change her mind and to reclaim the child, provided that this may be done without psychological harm to the child, and (2) ensure that the child will not be taken from the adoptive parents after one of them has become the psychological parent of the child. See Comment, Parental Consent: The Need For An Informed Decision In The Private Adoption Scheme, 47 La.L.Rev. 890, 892 (1987). *1017 However, blame for the delays must be placed not only on the courts for failing to expedite hearings and decisions, and not only on the parties, such as those in the present case, who fail to request expedition. The basic problem is with the statute which contains no provision for expedited hearings or machinery for calling the need therefor to the courts’ attention. Therefore, this court recommends to each judicial and legislative reform body that this problem be addressed and that remedial legislation and court rule changes be proposed as soon as possible. The clerk of this court is hereby instructed to send a copy of this opinion to each law reform body.
Pending changes in the statute and court rules, this court, exercising its supervisory jurisdiction, orders that each court handling a contested private adoption matter shall proceed expeditiously and within the following time frames: (1) The trial court, upon receiving formal or informal notice that the natural mother has revoked her consent to the surrender or adoption shall hold a hearing and decide the best interest issue and any related issue within twenty days of the court’s receipt of such notice. (2) The trial court shall fix the return day of the appeal no more than twenty days from the day the estimated costs are paid. Emergency supplemental court reporting services may be applied for with the Judicial Administrator. (3) The court of appeal shall hear and decide an appeal taken from the trial court within twenty days of the lodging of the record on appeal. All courts are urged to comply with the spirit as well as the letter of this order to prevent delays that unjustly may destroy the natural parent’s rights under the statute or have a harmful effect upon the child.
Decree
For the reasons assigned, the judgment of the lower courts are affirmed as to the validity of the surrender, but vacated as to the best interests of the child, and the case is remanded to the trial court for a new best interests hearing, during which this court shall retain jurisdiction so that any dissatisfied party may apply directly here for relief.
AFFIRMED IN PART; VACATED IN PART; REMANDED TO THE TRIAL COURT FOR A NEW BEST INTERESTS HEARING; JURISDICTION RETAINED.
LEMMON, J., concurs.
CALOGERO, J., dissents and will assign reasons.

. The parties stipulated that the revocation was accomplished within the 30 day statutory period.

. The Private Adoption Act was amended by 1987 La.Acts No. 702, Sec. 1, effective July 9, 1987, after the act of surrender in this case was signed and the interlocutory decree of adoption was entered. As all the events in this case took place prior to the effective date of the amendment, this opinion will discuss the Act as it was written prior to amendment.

. This view prevails in other jurisdictions. Batton v. Massar, 149 Colo. 404, 410-11, 369 P.2d 434, 437 (1962) (duress and fraud); Re Adoption of P.R. McD., 440 So.2d 57, 58 (Fla.App. 4th Dist.1983) (duress); Duncan v. Harden, 234 Ga. 204, 206-7, 214 S.E.2d 890, 892 (1975) (error); Petition of Steve B.D., 111 Idaho 285, 723 P.2d 829, 835 (1986) (duress); In re Petition of Huebert, 132 Ill.App.2d 793, 796-99, 270 N.E.2d 464, 466-69 (Ill.App.Ct. 1st Dist.1971) (duress and fraud); Stotler v. Lutheran Social Service of Iowa, 209 N.W.2d 121, 127 (Iowa 1973) (error); Skaggs v. Gannon, 293 Ky. 795, 802-5, 170 S.W. 2d 12, 16 (1943) (error); In Re Surrender of Minor Children, 344 Mass. 230, 234-36,181 N.E. 2d 836, 838-40 (1962) (duress); Sorentino v. Family and Children’s Society of Elizabeth, 72 N.J. 127, 130-31, 367 A.2d 1168, 1169-70 (1976) (duress); Re Adoption of Anonymous, 60 Misc.2d 854, 304 N.Y.S.2d 46, 51-52 (N.Y.Surrog.Ct., Suffolk County 1969) (error); Re Adoption of Robin, 571 P.2d 850, 856-58 (Okla.1977) (duress); In re Adoption of F_, 26 Utah 2d 255, 258-60, 488 P.2d 130, 132 (1971) (duress).

. Valid private adoptions are permitted without any act of surrender in other situations: adoptions by grandparents and stepparents, and when a child has heen declared abandoned. La.R.S. 9:422.1 (grandparent and stepparent adoptions); La.R.S. 9:403 (adoptions of abandoned children). Arguably, La.R.S. 9:429 recognizes that parental consent to a private adoption may validly be given in a notarial act that fails to meet all the requirements of La.R.S. 9:422.3. In re RLV, 484 So.2d 206, 210-17 (La.App.1st Cir.1986) (citing In re CDT: The Need for Greater Clarity in Private Adoption, 44 La.L.Rev. 845, 854 n. 46 (1984)); contra In re CDT, 415 So.2d 315, 317-18 (La.App.2d Cir.1982).

. See also Stotler v. Lutheran Social Service of Iowa, supra, 209 N.W.2d at 128; In re Adoption of F_, supra, 26 Utah 2d at 260-64, 488 P.2d at 132-33; 27 Am.Jur.2d, Equity, Sec. 34, 237; 30A C.J.S., Equity, Sec. 479.

. See La.Civ.Code art. 146(C) (custody); La.Civ.Code art. 263 (tutorship of minors); La.Code Juv.Pro. art. 85 (children in need of care); La.R.S. 9:403(C) (disposition as to children determined abandoned); Comment, Termination of Parental Rights in Adoption Cases: Focusing on the Child, 14 J.Fam.L. 547, 550-58 (1975-76); Note, In the Child’s Best Interests: Rights of the Natural Parents in Child Placement Proceedings, 51 N.Y.U.L.Rev. 446, 448-49 (1976).

. For a particularly insightful analysis of the authorities and helpful assessment of their priorities see Mnookin, Child-Custody Adjudication: Judicial Functions In The Face of Indeterminacy, 39 L. & Contemp.Probs. 225 (Summer 1975). We have relied extensively on this source in our own analysis.