578 So.2d 988 (1991)
In the Matter of ADOPTION OF Michael and Jimmy SMITH.
No. 91-CA-0544.
Court of Appeal of Louisiana, Fourth Circuit.
April 12, 1991.
Writ Denied June 14, 1991.
*989 Ann Maclaine, Advocacy Center for the Elderly and Disabled, New Orleans, for appellant.
Jack A. Quarles, Jr., Gretna, for appellees.
Before GARRISON, WILLIAMS and ARMSTRONG, JJ.
WILLIAMS, Judge.
In this private adoption proceeding, intervenor Mary Louise J. claims the trial court erred in finding valid the act of surrender which she signed on November 12, 1987. We agree. Due to Mary Louise's level of mental retardation, in combination with her state of mind caused by her anxiety over her non-surrendered child's injuries and her trusting dependence upon the adopting parents, she did not understand that by signing the act of surrender, she was terminating her parental rights to her two oldest children. The trial court's judgment denying Mary Louise's motion to invalidate the act of surrender is, therefore, reversed.

FACTUAL AND PROCEDURAL HISTORY

A. Mary Louise J.
Intervenor, Mary Louise J., is the biological mother of Michael LaKeith and Jimmy Lee J., the subjects of this adoption proceeding. At a relatively early age, she was diagnosed as being mentally retarded and placed in a special education program. She received a special education certificate, following completion of the twelfth grade. Two of her former teachers label her as trainably mentally retarded with poor academic skills and poor adaptive behavior. Due to her disability, she receives social security income benefits.
Debra Martin West, an expert in assessment of persons with mental and developmental disabilities, testified at the hearing on the motion to invalidate that Mary Louise has adapted well to her environment and, as a result, is able to function at a mildly mentally retarded level. Her evaluation revealed Mary Louise has the ability to remember numbers, street addresses, *990 birthdates and telephone numbers. However, she reads at second grade level and her auditory processing skills function at the 6 year, 7 month (1st grade) level. Consequently, she does not conceptualize well, but can understand concrete words.
West testified that Mary Louise tries to please others. Rather than disappoint, when she does not understand conceptual issues, she pretends to understand by nodding her head and smiling. West testified that while Mary Louise cooks and performs general housework on her own, she remains dependent upon assistance from others for such activities as using the telephone, taking public transportation, paying bills, purchasing groceries, and dispensing over the counter medications to her children. West also found that when Mary Louise is upset or under stress, her ability to understand decreases. Based upon her assessment, West did not believe Mary Louise was capable of understanding the implications of signing the act of surrender. She testified the only way Mary Louise could have understood the concept of "termination of parental rights" and of "visitation at the adoptive parents' discretion," was if she had been bluntly informed her children were being taken away from her and she could never again see them.

B. Confecting the Act of Surrender
The record and transcripts of the October 26, 1989 hearing on the motion to annul the judgment of adoption and the January 22, 1991 hearing on the motion to invalidate the act of surrender, reveal the following sequence of events:
Michael LaKeith, born in Natchez, Mississippi on February 22, 1984, and Jimmy Lee, born in Natchez, Mississippi on November 26, 1984, are the natural offspring of Mary Louise J. and Jimmy Lee Taylor.[1] A few months prior to Jimmy Lee's birth, Taylor committed suicide. His mother, Willa Marie Taylor, successfully aided Mary Louise in obtaining social security benefits for the two boys, totalling $760 a month.
In March of 1986, Mary Louise relocated the family to New Orleans to obtain asthma treatment for Jimmy Lee. On April 6, 1986, she gave birth to her third son, Tony Ray. After living with her brother for 2 weeks, she moved to Jordan Drive on the West Bank.
In the Spring of 1987, she met Emma Smith at a neighborhood health care facility. Emma's husband, Dwayne, managed a nearby apartment complex, earning $1300 to $1400 a month. See DHHR report to Judge Gray dated January 25, 1988. Within a brief period of time, Mary Louise became quite dependent upon Emma Smith. Emma would assist Mary Louise in purchasing groceries, paying bills, and cashing the social security checks she received for the older boys and for herself. Thereafter, the two families decided to move into a double house located at 304-306 LeBouef Street, in the Algiers Section of New Orleans.[2]
In June, the Smiths drove Mary Louise and her children to Roxy, Mississippi, to visit the older boys' grandmothers, Willa Taylor and Laura Lee Collins Dabney Harris. At the hearing on the motion to invalidate, the two grandmothers testified that, during the visit, no one indicated that the older boys were living with the Smiths. In July, Mary Louise transferred Michael LaKeith and Jimmy Lee's social security checks to the Smiths. Mary Louise testified *991 Emma had her tell social security personnel that Emma was her sister.
During August or September, Willie J. Taylor, a lessee in the apartment complex managed by Dwayne, who was out of a job and unable to pay rent, became friends with the Smiths and Mary Louise. According to Taylor, he moved in with Mary Louise and her children in September or October. Taylor testified that Mary Louise's children had poor table manners and required discipline. He commented that she spent a considerable amount of time with the children and she was very dependent upon Emma. He testified that in November or December, 1987, Michael LaKeith and Jimmy Lee's clothing were moved to the Smiths' side of the duplex.
On October 22, 1987, Tony Ray was accidentally burned while bathing. Mary Louise testified that the older boys were supposed to be in bed. When she left the room to get a towel, they ran into the bathroom and turned on the hot water. Tony was hospitalized for several weeks. Mary Louise was distraught. She spent every day at Charity Hospital with Tony, while the Smiths cared for her two older boys. Social workers investigating the cause of the accident, determined that it was accidental. Nevertheless, Mary Louise was upset by the investigation and the prospect that the State could remove the children from her care.
While Tony was hospitalized, the Smiths arranged the act of surrender. They drove Mary Louise to their attorney's office, where she was questioned about Michael LaKeith and Jimmy Lee's medical histories. The Smith's attorney then sent her to the office of Roland Ditta, an attorney who does not generally handle adoption and/or voluntary surrender cases. Ditta testified that he had not been informed that Mary Louise was "slow," mentally retarded, unable to read beyond the second grade level, distraught over Tony's hospitalization, or dependent upon the adopting parents. He testified that although he did not read the document to Mary Louise in full, he explained its terms to her and gave her an opportunity to read it. During his explanation, he used phrases like "surrendering parental rights" and "visitation would be up to the adopting parents." He testified that Mary Louise did not appear upset by the proceedings, rather, she nodded her head periodically and made brief responses such as, "it was in the best interest of the kids."
Willie Taylor, who was called as the Smiths' witness, testified that Mary Louise used the term "adoption" prior to November 12, 1987. He said she appeared to understand the term and seemed satisfied that the children were next door with the Smiths. He thought she understood "adoption" to mean she could see her children at any time. Taylor testified that he was unaware that Mary Louise was mentally retarded. She evicted him in January, 1988.
On December 1, 1987, the Smiths petitioned to adopt Michael LaKeith and Jimmy Lee. In their petition, they alleged that the boys had been in their physical custody for at least six months prior to their filing, i.e., June 1, 1987. The hearing on the petition was held on January 27, 1988. When asked, Emma advised the court that the only reason why she was not adopting the youngest child, Tony Ray, was because the mother intended to give him to his biological father. Even though an interlocutory decree of adoption had not been entertained, the court signed the final decree of adoption on February 4, 1988. Thereafter, Emma told Mary Louise that she and Tony Ray needed to find another place to live, and she was not permitted to see Michael LaKeith and Jimmy Lee.
Subsequently, Mary Louise called the police, claiming her children had been kidnapped. However, when Emma showed the police the adoption papers, the police told Mary Louise the children were no longer hers.
In September of 1988, the State removed Michael LaKeith and Jimmy Lee from the Smiths' custody, placing them in a foster home due to allegations of physical abuse. Numerous and differing explanations provided by Emma and Dwayne attempted to explain how Jimmy Lee's arm broke and/or *992 why it remained untreated. The children were eventually returned to their adoptive parents on April 5, 1990, ostensibly to begin bonding.
A motion to annul the judgment of adoption was filed on behalf of Mary Louise on July 26, 1989. A hearing was held on October 26, 1989, at which Mary Louise J., Roland Ditta, Emma Smith, social worker Brenda Allen and adoption investigator Beverly Walker testified. The juvenile court rendered judgment maintaining the final decree of adoption on November 17, 1989. Mary Louise appealed. A panel of this court found that the Smiths' peremptory exception raising the objection of prescription meritless. The panel also found that the issuance of a final decree of adoption at the initial hearing on January 27, 1988, a direct violation of the adoption statutes and, therefore, reversed the juvenile court's judgment. The issue of the validity of the act of surrender was pretermitted. Matter of Adoption of M. & J.S., 557 So.2d 370 (La.App. 4th Cir.1990).
On remand, on April 20, 1990, the juvenile court granted an interlocutory decree of adoption in the Smiths' favor, without testimony or legal argument from either party. The judgment effectively found the act of surrender valid. Mary Louise appealed and the juvenile court's judgment was reversed and the case remanded. State In Matter of Adoption of M. & J.S., 563 So.2d 1215 (La.App. 4th Cir.1990), writ den., 567 So.2d 619 (La.1990). The original panel clarified that by declaring the final adoption decree of January 27, 1988 null and void and reversing the judgment of November 17, 1989, the panel intended to remand the case "for a full hearing on an interlocutory decree, including the introduction of any additional admissible evidence, including expert testimony."
Thereafter, at the hearing on the motion to invalidate the surrender, held on January 22, 1991, on Mary Louise's request the juvenile court heard evidence only on the validity of the act of surrender, and not on the merits of the interlocutory decree. Supplemental testimony was obtained from Willa Taylor, Laura Harris, Debra West, Mary Louise J., Willie Taylor and Emma Smith. On February 7, 1991, the juvenile court rendered judgment declaring the act of surrender valid and finding that the adoption should proceed. From this judgment, Mary Louise appeals.

LEGAL PRECEPTS
Adopting parents, who are demanding performance under an act of surrender, must prove the existence of the natural parent's obligations thereunder to transfer custody and to consent to the adoption. LSA-C.C. art. 1831; In re J.M.P., 528 So.2d 1002, 1008 (La.1988). The exclusive method by which they may accomplish this proof under LSA-R.S. 9:422.3 is by demonstrating that the act was executed in accordance with the provisions pertaining to that mode of adoption. In re J.M.P., supra. See also In re J.M.P., supra., n. 4. Once these requisites are established, the formal act of surrender constitutes evidence of a legal and voluntary surrender. LSA-R.S. 9:422.3; Id.
If a natural parent asserts the act of surrender is null, or that it has been modified or extinguished, the natural parent must prove the facts or acts giving rise to the nullity, modification or extinguishment. LSA-C.C. art. 1831; In re J.M.P., supra. The burden is, therefore, on the natural parent to prove the lack of capacity to contract or the consent was vitiated by error, fraud or duress. See In re J.M.P., supra.
Lack of capacity constitutes the absence of an essential requirement for the validity of a contract. Litvanoff, "`Error' in the Civil Law", Essays on the Civil Law of Obligations 222 (J. Dainow, ed. 1969). The presumption is that all persons have the capacity to contract. Higgins v. Spencer, 531 So.2d 768 (La.App. 1st Cir.1988), writ den., 532 So.2d 106 (La.1988); Meadors v. Pacific International Petroleum, Inc., 449 So.2d 26 (La.App. 1st Cir.1984), writ den., 450 So.2d 964 (La.1984). The exception being that unemancipated minors, interdicts and persons deprived of reason at the time of contracting, lack legal capacity to contract. LSA-C.C. art. 1918.
*993 Lack of capacity must be shown by convincing evidence. Meadors v. Pacific International Petroleum, Inc., supra. A noninterdicted person, claiming he was deprived of reason at the time of contracting, may rescind an onerous contract for lack of capacity only upon showing that the other party to the contract knew or should have known of the incapacity. LSA-C.C. art. 1925; Higgins v. Spencer, supra.; Coburn Finance Corp. v. Bennett, 241 So.2d 802 (La.App. 3d Cir.1970) [22 year old with a mentality of a 5-6 year old, being sued as maker of a promissory note by the holder/money lender who had observed and been informed of the mental deficiency, was found not to have the contractual capacity to enter into the contractual relationship so that the contract was void for want of consent]; Smith v. Blum, 143 So.2d 419 (La.App. 4th Cir.1962). See also Succession of Molaison, 213 La. 378, 34 So.2d 897, 903 (1948) ["Where parties of somewhat equal experience and mental capacity enter into an engagement, the courts are reluctant to disturb it unless there is fraud. However, it is the duty of the courts to carefully and painstakingly investigate the circumstances surrounding transactions between a person of limited mental capacity and one experienced in business affairs in order that substantial justice might be meted out."].
A vice of consent impairs the freedom of the party's will, thereby causing a defect in his consent. See Litvanoff, supra. Consent may, therefore, be vitiated by error, fraud or duress. LSA-C.C. art. 1984. Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party. LSA-C.C. art. 1949; In re J.M.P., supra.; Wuertz v. Craig, 458 So.2d 1311 (La.1984) [a facially valid act of surrender was invalidated due to the immediate influence of a threat]. Consequently, a party may rescind a contract when the error of cause is on the nature of the contract, on the thing that is the contractual object or on a substantial quality of that thing. See LSA-C.C. arts. 1950, 1952; Lowery v. Anderson, 265 So.2d 644 (La.App. 2d Cir.1972) [elderly woman with a 3d grade education and little ability to read or write, did not fully understand the nature of the rights being released; consequently, she was allowed to rescind the release based on error due to the undue advantage of the party insisting upon the release]; Harris v. Stockman, 197 So.2d 365 (La.App. 2d Cir.1967) [the release excecuted by plaintiff was not given effect because the plaintiff acted under error as to the matter in dispute and an unfair advantage resulted on behalf of the adjuster].

APPLICATION OF PRECEPTS TO THE ACT OF SURRENDER
The evidence conclusively shows Mary Louise lacked capacity to execute the act because she was deprived of reason at the time, and she executed the act under error of cause because she did not understand the nature of the act of surrender.
Although Mary Louise has adapted well and learned to function in her environment, her limited mental capacity is uncontested. Also uncontested is the Smiths' knowledge of her deficiency and her dependency upon Emma Smith. The evidence forcefully reflects the probability that Mary Louise was dominated by the Smiths and induced by them to execute the act of surrender.
The evidence reflects that Mary Louise is virtually illiterate, reading at second grade level. She possesses auditory processing skills of a first grader. Stress diminishes her ability to comprehend. When she does not grasp conceptual words or ideas, she pretends she understands by nodding her head and smiling. West, the expert who examined Mary Louise to assess her developmental disabilities, concluded she was incapable of understanding the implications of executing the act of surrender. She stated that (prior to this litigation) Mary Louise could not understand the conceptual issues of "termination of parental rights" and "visitation at the adoptive parents' discretion." West testified that for Mary Louise to have understood the implications *994 of the act, she needed to be told that if she signed the document, the children would be taken away from her and she could never see them again.
Roland Ditta, the attorney who represented Mary Louise at the execution of the act of surrender, testified he had not been informed that she is "slow," mentally retarded, unable to read beyond second grade level, or that she was distraught over her youngest son's hospitalization and dependent upon the adopting parents. He testified that his explanation of the ramifications of the act included phrases similar to "she was surrendering her parental rights" and "visitation would be up to the adopting parents." He said he thought she understood the proceedings because she periodically nodded her head and informed him it was in the best interest of her children.
Ditta's testimony reveals that he did not explain the language of the act in the type of simplistic terms a first or second grader could understand. Mary Louise's difficulties with conceptual words make it unlikely that she would have understood the implications of Ditta's use of the words "adoption," "surrender," "visitation," "parental rights," and "termination." Although Taylor stated that Mary Louise used the word "adoption" in an apparently correct manner, the term could possibly have been misused while she related that the boys were "sleeping over" or "staying with" the Smiths while Tony Ray was hospitalized.
As the adopting parents who arranged for the surrender, the Smiths had an obligation to insure that Mary Louise fully understood the significance of executing the act. Without full and frank disclosure at a level which she could comprehend, the scene was set for her unknowing termination of her constitutionally protected right to the care, companionship and custody of her children.
An apparent advantage has been taken of Mary Louise's intellectual deficiency and of her anxious state of mind caused by the accidental injuries of her youngest child, Tony Ray. Under the circumstances, the juvenile court erred in finding valid the act of surrender she executed on November 12, 1987. Due to Mary Louise's lack of capacity, the act is a relative nullity. Due to her error as to the nature of the contract, she has the right to have it rescinded.
For the reasons stated, the judgment upholding the validity of the November 12, 1987 act of surrender executed by Mary Louise J., is reversed. All costs to be paid by appellees.
REVERSED.
NOTES
[1] During oral argument on April 5, 1991, counsel for the Smith's stated that Michael LaKeith and Jimmy Lee both attend special education classes.
[2] Emma and Dwayne's family, consisting of one child and one on the way, occupied the 3 bedroom side of the double and Mary Louise's family occupied the 2 bedroom side. On June 5, 1987, the Smiths signed a lease/purchase agreement for the LeBouef Street property. On September 25, 1987, they purchased the property for $46,659.86. Their $3,000 deposit on the house (in installments of $1600, $400 and $1000) coincided with Mary Louise's receipt of backlogged social security checks, totalling $3000. Their mortgage payment is $455 a month. Emma testified Mary Louise was charged $300 a month rent until she transferred to them the boys' social security checks. Thereafter, they allowed Mary Louise to live in the apartment rent free.