h CARAWAY, J.
Upon the mother’s request for a child in need of care, these proceedings were instituted and the child was placed in the custody of the State and adjudicated in need of care. Following the mother’s act of surrender of her parental rights, her attorney moved to annul the act of surrender because of her mental incapacity, The trial of the motion presented testimony of a psychiatric expert and the presurrender counselor concerning the mother’s competency. Rejecting that testimony, the trial court annulled the act of surrender. We reverse the ruling.

Facts and Procedural History

The State, through the Department of Social Services (“State” or “DSS”), instituted this child in need of care proceeding for the child, D.J., alleging that DSS received a request for protective services from M.J., the mother of the child. M.J. called the agency on June 16, 2000, indicating that she could not take care of D.J. (then age four years) and her newborn son, that D.J. was “getting on her nerves,” and that D.J. would be better off in foster care.
As a result of M.J.’s call, a DSS worker visited the home where M.J. and her two sons were living. M.J. and the two children occupied a bedroom of a house, which was in good condition considering that the *558 rest of the house was filthy, unkempt and roach-infested. Family intervention services were offered to the mother, including daycare for D.J. in a nearby church, as an alternative to foster care placement.
Five days later, M.J. called the child protection hotline and again requested that D.J. be placed in foster care because he was making too much | ¡¡noise. The following day, M.J. visited the State Office Building to apply for food stamps and family assistance. When DSS visited M.J. again, she told the worker that she contacted the State’s Office of Community Services requesting that D.J. be adopted and also contacted an adoption agency in Baton Rouge. Even though the day care was “going well,” she was unable to put up with D.J.’s behavior. During the next several days, DSS workers visited M.J. and talked with her about the difference between foster care and adoption. M.J. maintained that although she could care for the newborn, she could not care for D.J.
On July 6, 2000, the State filed a verified complaint alleging that both M.J. and the man with whom she lived were verbally abusive and threatened D.J. with physical abuse. The man, according to M.J.’s testimony, is the father of her second child. An instanter order of custody issued July 6, 2000, placing custody of D.J. with the State.
M.J. appeared at the continued custody hearing scheduled for July 10, 2000, and accepted service of the petition alleging that D.J. was a child in need of care under La. Ch.C. art. 606. Counsel was appointed to represent D.J.’s alleged father; service of the petition on him was never effected. The custody hearing was continued until July 12, 2000, at which time M.J. stipulated through counsel that custody of D.J. continue in the State but denied the allegations of the petition.
The parties returned to court six weeks later for the adjudication phase of the proceeding. M.J. stipulated that D.J. was in need of care without admitting the allegations of the petition. At the dispositional hearing three days later, on August 28, 2000, the court continued D.J.’s | «legal custody in the State with placement in foster care and ordered that the mother be evaluated by a psychiatrist. The judgment of disposition recited that the goal of the case plan[1] was “surrender of parental rights by the mother.”
The initial case review hearing was held on October 5, 2000. The court found that D.J. continued to be a child in need of care, recognized adoption as the case plan goal and ordered continued placement in foster care. The court ordered that the “[department may pursue surrender counseling with the mother, but may move the court for approval of any proposed surrender.” The court also authorized early filing of a termination of parental rights petition by the DSS.
On November 13, 2000, M.J. executed a voluntary act of surrender for adoption in authentic form relinquishing her parental rights to D.J. A licensed clinical social worker executed an affidavit stating that M.J. had received the two counseling sessions prior to the surrender as required by law. The social worker’s affidavit further stated that “she appears to understand the nature of this act.” Pursuant to La. Ch.C. art. 1181, the act of surrender was filed in these proceedings on November 16, 2000. Two weeks later, a petition to annul the act of voluntary surrender was filed in juvenile court alleging that M.J. was mentally incapable of making a knowing and voluntary surrender.
*559 A hearing on the petition to annul was held on January 10, 2001. Dr. Greg Brown, a board certified psychiatrist, testified regarding his evaluations of both M.J. and D.J., on September 5 and September 25, 2000, | ¿respectively. D.J.’s chief diagnoses were 1) post traumatic stress disorder; 2) victim of abuse; 3) encopresis (accidental bowel movements); 4) enuresis (bedwetting); 5) ADHD-combined type (attention deficit hyperactivity disorder); 6) phonological (speech) disorder; 7) possible impulse control disorder. On his examination and review of D.J.’s medical history, Dr. Brown opined that D.J. improved significantly since being placed in foster care and that it would not be in D.J.’s best interest to return to his mother’s care. Dr. Brown also expressed his hope that M.J. would be permitted to relinquish her parental rights and put D.J. up for adoption.
Dr. Brown diagnosed M.J. with major depressive disorder, recurrent — severe with psychosis and obsessive compulsive disorder. In addition to adjusting the dose of some of her medication, he prescribed an anti-psychotic medication to stabilize her mood and anxiety level and to minimize her psychotic symptoms. Dr. Brown’s September 5, 2000 report concluded that M.J. was competent and aware of her decision to give D.J. up for adoption. Based on his report, Dr. Brown testified at the January hearing that M.J. was not “floridly psychotic, hallucinating and delusional,” and that she was mentally competent to execute the surrender in spite of her psychosis. At the close of cross-examination, the court questioned Dr. Brown about the unusual nature of M.J.’s decision. Dr. Brown admitted that it was unusual, but maintained that she was competent and fully aware of her actions. Dr. Brown even characterized M.J.’s decision as logical, given the concerns she had expressed to him about not being able to care for D.J.
| bM. J. also testified at the January 10, 2001 hearing, reiterating that she wanted to surrender her rights to D.J. and that she understood the voluntary act of surrender when she signed it. The social worker who conducted the surrender counseling also testified that she felt M.J. was competent. The notary public before whom the surrender was executed testified that M.J. appeared competent when she signed the surrender.
At the conclusion of the hearing and based on the above testimony, the court ordered that M.J. be compelled to submit to a second psychiatric evaluation. The evaluation never took place because M.J. missed the appointment. When the parties appeared in court at the regular six month case review hearing on April 17, 2001, they first addressed the missed psychiatric appointment. The court again heard argument on the motion to annul and thereafter ruled that the surrender was a nullity. The judgment annulling the surrender was signed on April 17, 2001. In reasons orally assigned, the court found that M.J. had a mental illness and was thus incapable of giving a knowing and voluntary surrender; that her decision to permanently sever her parental rights was not rational; and that her refusal of services offered by the State was unreasonable. It is from this judgment that DSS appeals.

Discussion

Title XI of the Louisiana Children’s Code provides the exclusive means by which a parent can voluntarily relinquish her parental rights to a child for the ultimate purpose of adoption. La. Ch.C. art. 1101. To the extent there are special provisions set forth in Title XI of the Code, a voluntary act of surrender is subject to those provisions and not to ^conventional *560 obligations law. La. Ch.C. art. 1104(A). The act of surrender shall be presumptive evidence of a legal and voluntary surrender, only if it contains every element required by La. Ch.C. art. 1122 and is in all other respects executed in accordance with the provisions of Title XI. La. Ch.C. art. 1104(B).
Any parent has the capacity to surrender his or her child for adoption, subject to three exceptions. La. Ch.C. arts. 1108 and 1111. The first exception provides that a parent may not execute a private surrender once custody of the child has been removed by proceedings under either Title VI (Child in Need of Care) or Title X (Termination of Parental Rights) of the Louisiana Children’s Code. La. Ch.C. art. 1112. The second exception addresses surrenders by those parents who are minors. La. Ch.C. art. 1113. The third exception, which the trial court found to apply in this case, deals with mentally incapacitated persons. La. Ch.C. art. 1114. Article 1114 reads as follows:
Any parent who has been interdicted or who the court finds to be mentally incapable of giving a knowing and voluntary surrender shall not execute an act of surrender. Any act of surrender executed by an interdicted or mentally incapacitated parent is subject to annulment under Chapter 12 of this Title.
Additionally, La. Ch.C. art. 1147 provides grounds under which the court may annul an act of surrender:
No act of surrender shall be subject to annulment except upon proof of duress or fraud, notwithstanding any provision of law to the contrary.
See also, La. Ch.C. art. 1123 and Comments — 1991. Our supreme court has held that the type of duress which justifies vitiation of consent to an act of surrender is of such nature as to cause one to have a reasonable fear of |7unjust and considerable injury to her person, property or reputation. In Re J.M.P., 528 So.2d 1002, 1009 (La.1988).
A surrendering mother is required to participate in at least two presurrender counseling sessions with a mental health professional. See, La. Ch.C. art. 1120. As explained in the comment to Article 1120, the counseling provision serves two purposes:
First, it is intended to effectuate the historic requirement of Louisiana law that a surrender for adoption be voluntarily executed with full knowledge of its consequences. See, Wuertz v. Craig, 458 So.2d 1311 (La.1984). Second, it is intended to provide greater insulation of a surrender from later attack by restraining, if not eliminating, the use of a ground often asserted as cause for an attempted annulment of a surrender: that the physical and emotional strains of pregnancy, birth and relinquishment make the birth mother especially vulnerable to overreaching.
For all adoptions, La. Ch.C. art. 1122 requires that the act of surrender contain specific information and declarations, substantially in accordance with the form provided for therein, and be executed in authentic form. Once executed in conformity therewith, the act of surrender is irrevocable and operates to extinguish parental rights unless subsequently nullified by fraud or duress or dissolved by a court of competent jurisdiction. La. Ch.C. art. 1122(B)(4).
The trial court’s decision to annul the act of surrender as a violation of Article 1114 required a finding of M.J.’s mental incapacity. The article suggests that such incapacity is the equivalent of that which is present in the case of an interdict, even though the parent has never been formally interdicted. The measure for interdiction *561 in former Civil Code Article 422 is an infirmity making one incapable of taking care of her person and | ^administering her estate. Under newly revised Civil Code Article 389, effective July 1, 2001, this same test for functional inability is now expressed as an infirm condition where one “is unable consistently to make reasoned decisions regarding the care of his person and property, or to communicate those decisions.”
From our review of the record, we do not find evidence indicating that M.J. was mentally incapable of caring for her person and her property in the same manner as that of an interdict. The record of her condition between September 5, 2000, when Dr. Brown interviewed her, until the January 10, 2001 hearing consistently reveals a person acting in society for the care of herself and her infant. While we agree that her decision regarding five-year-old D.J. is unusual, the expert testimony excluded the possibility that the decision was the product of a mental condition. Instead, Dr. Brown described her explanation of the surrender of D.J. as a reasoned decision in that M.J. admitted that her son’s condition might cause her to react forcefully, causing him harm.
Additionally, the testimony of the counselor who reviewed the act of surrender with M.J. on November 7 and 13, 2000, did not reveal that M.J. misunderstood the consequences of the surrender or was overwhelmed emotionally at the time of her execution of the surrender so that her act was not a knowing and voluntary act. The safeguard which the law specifically requires in the form of the two presurren-der counseling sessions cannot be swept aside without evidence of fraud, duress or a mental incapacity as discussed above.
| aFinalIy, the testimony of M.J. gives no indication that she was incapable of rational thought or coherent communication. Other than the past duress of her situation in attempting to care for D.J., M.J. did not claim that her act of surrender was made under the type of duress recognized by the supreme court in In Re J.M.P., supra, which would directly vitiate her consent at the time of execution of the act of surrender.
Accordingly, the trial court’s decision nullifying the act of surrender in this case is manifestly erroneous based upon the evidence adduced at trial. The ruling is reversed, ,and the case is remanded to the trial court for further proceedings.
REVERSED AND REMANDED.

. There is no copy of the case plan in the record.